# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF VIRGINIA
# Alexandria Division

| | |
|---|---|
| JUSTIN REED, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 1:18-cv-1454 |
| ) | Hon. Liam O'Grady |
| FAIRFAX COUNTY, VIRGINIA, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

This matter comes before the Court on Defendant Fairfax County's ("Defendant's" or "the County's") Motion for Summary Judgment. Dkt. 38. The motion is fully briefed, and the Court dispensed with oral argument as it would not aid in the decisional process.

## I. BACKGROUND

Plaintiff Justin Reed ("Plaintiff" or "Reed") filed an Amended Complaint (Dkt. 16) on February 22, 2019. In it, Reed alleges two claims under Title VII of the Civil Rights Act of 1964: Claim I – Discrimination in the form of a Written Reprimand Based on Religion and Religious Exercise; and Claim II – Retaliation in the form of a Retaliatory Written Reprimand. Dkt. 16 ¶¶ 18-21. The Amended Complaint refers to controversy surrounding accommodation for his religious beliefs as a Jehovah's Witness during a flag-raising ceremony at the Church of Latter-Day Saints on the Fourth of July in 2018. Religious discrimination claims can take two forms: disparate treatment; or failure to accommodate religious beliefs. The pleadings before the Court are consistent with the latter, a religious accommodation claim under Title VII.

Defendant moved to dismiss the action for failure to state a claim (Dkt. 17), and the Court denied the motion by Order on May 13, 2019 (Dkt. 24). Defendant filed the instant Motion for Summary Judgment on November 20, 2019.

## II. MATERIAL UNDISPUTED FACTS[1]

Plaintiff is a Jehovah's Witness. The Fairfax County Fire and Rescue Department ("FRD") hired Reed on September 24, 2012. From the time he was hired through about March 2013, Reed attended the FRD's Fire Academy as a recruit firefighter/medic, and completed new hire training. Training included the County's policies on discrimination and accommodation requests as well as the County's Personnel Regulations, standard operating procedures ("SOPs"), Rules and Regulations, Operating Manuals, and general policies; new hires also learned of policies related to standards of conduct, work hours, requesting sick leave, fitness for duty evaluations, personal injury reporting, minimum staffing, following/defying orders, chain of command, coordination and cooperation, and resource deployment. *See* Dkt. 39 Exs. 2, 12-23.

During his employment with the Fairfax FRD, Reed received warnings regarding his responses to guidance and correction.[2] He was assigned to Battalion 2, Fire Station 1 in March 2013, but was transferred to Battalion 2, Fire Station 29 a few months later, on June 1, 2013. While at this second post in August 2014, Reed received an annual performance evaluation noting that, "[firefighter]/medic Reed should develop the ability to receive and internalize

---

[1] As Defendant notes, citing Local Civil Rule 56(B), "Reed only responds [in his Opposition brief] to paragraphs 38, 40, 42, 44, 45, 51-53, 56, 61, 68-74, 76, 79, 80, 83, 90, 92, 94-96, 101-105, 107-112, and 115." It is true that these are the paragraphs that Plaintiff addresses directly, though the Court may find other facts to be disputed in the record. Dkt. 42 at 2 n.3.

[2] See Dkt. 39 Ex. 2, Reed Dep. 268:4-12 ("Q: [The Sept. 12, 2018, written reprimand] goes on to say 'You continue to demonstrate the inability to accept constructive criticism from your superiors and remain professional.' Do you see that there? A: Yes. Q: And you'd agree that this isn't the first time that you've received feedback regarding your inability to accept constructive criticism? A: Correct.").

2

feedback and corrective advice." Dkt. 39 Ex. 33. Lieutenant Stephen Hartman, Captain II Gregory Hunter, Captain Mark Schroeder, and Battalion Chief ("BC") Ryland Kendrick all noted some difficulty with Plaintiff's performance and ability to accept feedback. Capt. Hunter and BC Kendrick attempted to issue a Performance Deficiencies and Improvement Plan ("PIP") on October 10, 2014, but Reed refused to sign it. Dkt. 39 Ex. 2, Reed Dep. 64:2-7 ("Q: How many times did you meet with Kendrick and Hunter in their effort to have you sign a Performance Improvement Plan? A: At least twice. Q: Did you ever sign it? A: No."). Plaintiff was soon transferred again on November 14, 2015, to Battalion 3, Fire Station 34 – B-shift, as an advanced life support ("ALS") provider.[3]

Fire Station 34 has a fire engine (Engine 434) and medic unit (Medic 434); an engine must be staffed with a four-person crew, and a medic unit is required to be staffed with a two-person crew. Captain Elton Polen was the station captain for Fire Station 34 – B-shift when Plaintiff arrived in November 2015. He took part in a heated exchange with Reed on an occasion when Reed failed to check the blood pressure of a patient on an ALS medical call. After this exchange, Defendant states that Capt. Polen "coached Reed regarding his defensiveness and inability to accept correction." Dkt. 39, List of Material Facts ("LMF"), ¶ 23. Plaintiff does not offer any information to the contrary.

### A. February 16 – March 16, 2018

When Reed returned from a vacation in Bali with a suspicious rash, he suspected the rash might be Methicillin-resistant Staphylococcus aureus ("MRSA") and sought emergency medical attention on or around February 16, 2018. Though the emergency physician did not believe the

---

[3] Plaintiff does not dispute the truth of any of the facts pre-dating his time at Fire Station 34, but implies they are irrelevant to this case. Dkt. 41 at 3. He states that they are only included for inflammatory purposes. *Id.* at 9 n.1. The Court finds the progression of behavior to be relevant to Plaintiff's employment status with the FRD.

3

rash to be MRSA, Reed received a prescription. He filled the prescription but did not take the medication, which worried shift mates at the FRD the next day. On February 17, Reed was blamed for a disruption at the station after Lieutenant Munt—covering for Capt. Polen—became involved in the controversy about Reed's rash. Lt. Munt resorted to sending a photo of the exposed rash to Dr. Donald Stewart for review at the Public Safety Occupational Health Center ("PSOHC"). Dr. Stewart cleared Reed to stay at work if the rash was "dry, clean, and covered," and Reed initially complied. Dkt. 39 Ex. 26, at 1. But Reed was frustrated for being blamed for the disruption and stated he was going home on sick leave. He left the fire station without securing express approval to leave work mid-shift, and without signing out of the log book.

As a result of Reed's departure mid-shift, Engine 434 could not be fully staffed, yet was not marked "out-of-service;" soon after Reed's departure, it was dispatched for an ALS emergency. Engine 434 was "out-of-service" for approximately 40 minutes before the FRD found a replacement for Reed; it "scratched" on the emergency call, leaving Medic 434 on Route 66 without the engine to block and control traffic. This incident was reported up the chain of command to DC Garett, Deputy Chief for B-shift, and Battalion Chief Strickland subsequently began an investigation. The investigation included gathering statements from the shift. Plaintiff spoke with Lt. Munt later that same day regarding procedures for leaving during a shift.[4]

On February 19, 2018, Reed had a telephone conversation with Capt. Polen, where Capt. Polen informed Reed of the escalation to DC Garrett; Reed abruptly ended the call shortly after learning of the escalation. On February 22, 2018, Reed had a telephone conversation with BC Strickland wherein BC Strickland informed Reed he would be reprimanded. This conversation

---

[4] Reed does not dispute that Engine 434 scratched on February 17, 2018, but insists that he "was not disciplined for walking off the job without notice." Dkt. 41 at 9. Rather, he concedes that he was orally reprimanded "for being disrespectful over the phone to three department officers." *Id.*

4

was also contentious and cut short by Reed. Capt. Polen discussed Reed's behavior with him again when he returned to work several days later. At the decision of DC Garrett, Reed was ultimately issued an oral reprimand for his conduct related to the events of and fallout from February 17, 2018. In late April 2018, Reed sustained a work-related injury and was put on light duty.

**B. July 4, 2018**

When Reed returned to full duty in June 2018, Capt. Polen had retired, and Captain Stephen Hurst had assumed his position at Fire Station 34, B-shift. On July 4, 2018, Reed arrived at work at 6:15 a.m. and thereafter learned of an invitation from a local Boy Scout troop to attend a flag raising ceremony and pancake breakfast at a nearby Church of Latter-Day Saints. It was to be at 8:00 a.m. that morning. As a Jehovah's Witness, the ceremony conflicted with Reed's beliefs. Reed spoke with Capt. Hurst at approximately 6:50 a.m. before the ceremony to say that his religious beliefs prevented his participation in the event, and Capt. Hurst purportedly asserted his authority over Reed in the situation and replied, "well, you're going." Dkt. 39 LMF, ¶ 52.

Other than the shift lineup from approximately 7:00 to 7:20 a.m., Reed did not engage in other FRD tasks or conversations with shift mates or superiors before departing for the flag raising ceremony. Instead, he texted his friend and his wife on his personal phone, including telling his wife, "there's going to be drama." Dkt. 39 Ex. 2, Reed Dep. 207:3-14. Reed then rode silently to the ceremony in Engine 434 with Capt. Hurst, Upchurch, and Withrow. Reed found Capt. Hurst's order to be unlawful, but did not invoke the procedures set out in FRD's Rule 700.04 before the ceremony or at any point that day. *Id.* at ¶ 54; *see Id.* Ex. 12 at 16 ("At the time the unlawful order is issued, the employee shall advise the issuing authority of its

5

illegality. Should that authority persist in demanding compliance, an employee of superior rank or status to all parties involved should be summoned to decide the controversy.").

Upon arrival at the Church of Latter-Day Saints, Reed remained in Engine 434 and never spoke with anyone from FRD or the community. He "decided that God came before his job" when it came to the ceremony, but still kept his post "near his apparatus and shift mates in the event of an emergency call." Dkt. 41 at 2. Engine 434 and the rest of the FRD shift arrived at the Church of Latter-Day Saints after 8:00 a.m., and thus missed the flag raising ceremony in its entirety. Reed was unaware of this fact because he remained in the engine for the duration of the visit. Still without communication with anyone at the FRD, Reed returned to Fire Station 34 with the shift by approximately 9:30 a.m.

About an hour later, at 10:30 a.m., Engine 434 was dispatched to assist Fairfax City Fire and Rescue on an emergency call. From the emergency scene, the crew decided Reed would drive the Fairfax City medic unit to Fairfax Hospital, and Withrow would go with Reed to assist the Fairfax City paramedics in the back of the vehicle. Upchurch and Capt. Hurst placed Engine 434 out of service to go retrieve Reed and Withrow at Fairfax Hospital once they completed the run. Reed saw that Engine 434 was at Fairfax Hospital to pick them up, but on the way to the engine, Reed and Withrow stopped to talk with other paramedics about a patient they had just dropped off. Capt. Hurst approached them at some point in the conversation to tell them to return to the engine.

Back at Engine 434, Upchurch reprimanded Reed and Withrow for the delay, and told them to return more quickly in the future. Plaintiff alleges that Upchurch yelled, "don't f*ing make us wait like we made you f*ing wait." Dkt. 41 at 5. Defendant stipulates that Upchurch "counseled them that they needed to more promptly get back to the engine." Dkt. 39 LMF, ¶ 72.

Withrow apologized to Upchurch, but Reed immediately took issue with the exchange; when Capt. Hurst did not agree with Reed, Reed reacted vehemently, losing composure, throwing his personal phone, and expressing disdain for the County and his coworkers. Capt. Hurst also said he intended to pursue the matter, including the morning events at the church,[5] but informed Reed that they would discuss things back at the station. *See* Dkt. 39 Ex. 43, Hurst Dep. 19:4-20.

At some point between the verbal altercation and the return to Fire Station 34, Reed stated he was going home on sick leave. There was no response to this statement from anyone in Engine 434. Upon arrival at the station, Reed left without discussing the matter with Capt. Hurst, or anyone else on the shift, in further detail. Meanwhile, Capt. Hurst called his own supervisor, Captain Corey Matthews. Capt. Matthews told Capt. Hurst to retrieve Reed, seeking to address the situation at that time and perhaps coordinate with another station to avoid placing units out of service, but Reed was already gone.

Capt. Matthews initiated efforts to find a replacement for Reed for the remainder of his shift, but Engine 434 remained out of service for approximately 1.5 hours. Dkt. 39 LMF, ¶ 88. Pursuant to FRD procedures, Capt. Matthews began an investigation into the July 4, 2018, departure as well as Reed's past performance more generally.

### C. Written Actions Subsequent to July 4, 2018

On July 6, 2018, Reed filed a complaint of race and religious discrimination with the Fairfax OHREP. On August 21, 2018, OHREP prepared a detailed report stating that the allegation of religious discrimination was not substantiated. *See* Dkt. 18-1.

---

[5] Withrow in his deposition testified that Upchurch, when addressing Reed in the engine at Fairfax Hospital, first mentioned consequences from not participating in the morning ceremony. Dkt. 39 Ex. 47, Upchurch Dep. 70:1-14.

7

At DC Garrett's determination, Reed received a written reprimand on September 12, 2018, for the misconduct of July 4, 2018. It included raising his voice, engaging in a verbal altercation with Upchurch, exhibiting disrespect to Capt. Hurst, stomping his feet,[6] and abruptly leaving work mid-shift without first securing approval to do so. *See* Dkt. 39 Ex. 80. The final written reprimand does not address any conduct or incident related to the flag raising ceremony; rather, it cites "an argument [at Inova Fairfax Hospital] with Master Technician Robert Upchurch," and Reed's continued inability to accept constructive criticism from superiors. *Id.* Capt. Hurst and Upchurch were also reprimanded in connection with the events at Inova Fairfax Hospital on July 4, 2018. Capt. Hurst claims he never personally requested discipline for Reed, and did not see the written reprimand letter until it was finalized.

Finally, Reed received a performance evaluation from Capt. Hurst on October 9, 2018, with an overall "EMS" rating. The "EMS" rating has the following accompanying language: "Performance <u>exceeds agency minimum standards</u> for all critical job elements. Employee <u>qualifies for a merit pay increment</u> on the basis of performance if otherwise eligible on the basis of length of service in grade." Dkt. 39 Ex. 84, at 6 (emphasis original).

### III. LEGAL STANDARD

Federal Rule of Civil Procedure 56 states that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court should state on the record the reasons for granting or denying the motion." Fed. R. Civ. P. 56(a). The trial judge is not required to make findings of fact at the summary judgment stage. "The inquiry performed is the threshold inquiry

---

[6] Plaintiff objects to the fact that he stomped his feet and was otherwise destructive, but the actual document reprimands Reed for, *inter alia*, stomping his feet and punching department equipment. Dkt. 39 Ex. 80, at 1.

8

of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). While the burden is on the moving party to demonstrate entitlement as a matter of law, the opposing party "must 'set forth specific facts showing that there is a genuine issue for trial.'" *Dash v. Mayweather*, 731 F.3d 303, 311 (4th Cir. 2013) (quoting *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003). We construe the evidence in the light most favorable to Reed, the nonmoving party, and draw all reasonable inferences in his favor. *Rosetta Stone Ltd. v. Google, Inc.*, 676 F.3d 144, 150 (4th Cir. 2012) (citation omitted).

Under Title VII, "an employer has a 'statutory obligation to make reasonable accommodation for the religious observances of its employees, short of incurring an undue hardship.'" *E.E.O.C. v. Firestone Fibers & Textiles Co.*, 515 F.3d 307, 312 (4th Cir. 2008) (quoting *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 75 (1977)); *see also* 42 U.S.C. § 2000e(j) ("The term 'religion' includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business."). "In a religious accommodation case, an employee can establish a claim even though she cannot show that other (unprotected) employees were treated more favorably or cannot rebut an employer's legitimate, non-discriminatory reason for her discharge." *Chalmers v. Tulon Co. of Richmond*, 101 F.3d 1012, 1018 (4th Cir. 1996).

To state such a religious accommodation claim, "[a] plaintiff must ... show[] that '(1) he or she has a bona fide religious belief that conflicts with an employment requirement; (2) he or she informed the employer of this belief; [and] (3) he or she was disciplined for failure to comply

9

with the conflicting employment requirement.'" *E.E.O.C. v. Firestone Fibers*, 515 F.3d at 312 (quoting *Chalmers*, 101 F.3d at 1019). If the plaintiff establishes such a prima facie case, the burden shifts to the employer to show either (1) reasonable accommodation, or (2) undue hardship to the employer's business. *See Philbrook v. Ansonia Bd. of Educ.*, 479 U.S. 60, 67 (1986); *Chalmers*, 101 F.3d at 1019 (collecting cases). Either one of these conditions is sufficient; indeed, "if an employer has provided a reasonable accommodation, we need not examine whether alternative accommodations not offered would have resulted in undue hardship." *Firestone Fibers*, 515 F.3d at 312 (citing *Philbrook*, 479 U.S. at 68).

A prima facie case of retaliation requires a plaintiff to prove "(1) that she engaged in a protected activity; (2) that her employer took an adverse employment action against her; and (3) that there was a causal link between the two events." *E.E.O.C. v. Navy Fed. Credit Union*, 424 F.3d 397, 406 (4th Cir. 2005). There are two types of protected activities: opposition and participation. Opposition may include informal protests, an employee voicing his opinions to bring attention to discriminatory practices, or complaints about suspected violations. *Id.* Participation entails "(1) making a charge; (2) testifying; (3) assisting; or (4) participating in any manner in an investigation, proceeding, or hearing under Title VII." *Laughlin v. Metro. Washington Airports Auth.*, 149 F.3d 253, 259 (4th Cir. 1998). Although the Fourth Circuit has yet to rule on whether a request for accommodation is protected activity expressly under Title VII, it has ruled that a request for accommodation under the Americans with Disabilities Act is a protected activity. *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 577 (4th Cir. 2015) ("[Plaintiff] clearly engaged in protected activity by submitting a request for accommodation.").

## IV. DISCUSSION

Plaintiff Reed alleges a violation of Title VII for discrimination in the form of failure to accommodate his religion, and that a subsequent written reprimand also violated Title VII as a retaliatory action against him. For the following reasons, both claims must fail.

### A. Claim for Discrimination Under Title VII

*1. Reed's Discrimination Claim Survives Despite Defendant's Claim of Abandonment.*

Defendant Fairfax County argues it has already defeated the discrimination claim: "Reed does not address [Defendant's claim that Reed's religious beliefs were accommodated] in his Opposition, and he has therefore abandoned his discrimination claim." Dkt. 42 at 12-13. Defendant points to *LBCMT 2007-C3 Sterling Retail, LLC v. Sheppard*, No. 1:12-cv-470, 2013 WL 2151683, at *3 (E.D. Va. May 15, 2013), where this Court held that the *Sheppard* defendants abandoned an affirmative defense "by not addressing it in their Opposition." While courts in this and other Circuits have found that certain claims and defenses can be abandoned or waived for failure to pursue them in the pleadings,[7] the Court does not find it appropriate to do so here.

Plaintiff does address the religious accommodation issue for the flag ceremony, if indirectly, in assertions of fact in his Opposition. *See* Dkt. 41 at 4-5. While not present in the "Argument" portion of his brief, Plaintiff's Statement of Facts, Section II, is entitled "Reed

---

[7] *See, e.g., Hayes v. District of Columbia*, 923 F. Supp. 2d 44, 49 (D.D.C. 2013) ("It is understood in this Circuit that when a plaintiff files an opposition to a dispositive motion and addresses only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded.") (collecting cases); *Sherman v. Cty. of Suffolk*, 71 F. Supp. 3d 332, 355 (E.D.N.Y. 2014) ("[N]owhere in his papers does the Plaintiff articulate a substantive due process claim ... he is deemed to have abandoned it on this motion."); *Ferruchi v. Wal-Mart Stores, Inc.*, No. WDQ-11-0288, 2011 WL 1748573, at *5 (D. Md. May 5, 2011) ("[Plaintiff] has not addressed this argument in her opposition to Wal-Mart's motion. [Plaintiff] has abandoned this claim.").

11

Requested Religious Accommodation on July 4, Which Angered Capt. Hurst." *Id.* at 4. Reed did indicate that, had Capt. Hurst responded differently, "I would have, in that case, just asked for exactly what happened, just to remain in the engine." Dkt. 39 Ex. 2, Reed Dep. 205:12-13. But considering the matter in the light most favorable to Plaintiff, recharacterizing the events of July 4, 2018, retrospectively does not waive the claim entirely; the Court will consider both Plaintiff's discrimination and retaliation claims. Each is addressed in turn.

2. *Reed's Discrimination Claim Ultimately Fails Because the Written Reprimand Does Not Rise to the Requisite Level of Adverse Employment Action.*

First, Plaintiff's religious beliefs are not contested in this matter; it is established that he is an active Jehovah's Witness, in conflict with the July 4th flag raising ceremony that his shift attended. Second, Reed demonstrates that he informed his employer of this religious belief. While there are conflicting reports as to Reed's exact exchange with Capt. Hurst at Station 34 before the flag raising ceremony, Defendant does not dispute that Capt. Hurst was aware of his religious sensitivity to the event. Defendant states that "at approximately 6:50 a.m. [on July 4, 2018], Reed informed Capt. Hurst, who was wholly unaware of Reed's religious affiliation, that his religious beliefs prevented him from participating in the flag ceremony." Dkt. 39 LMF, ¶ 52. There is no genuine issue of material fact regarding the first or second element of the discrimination claim; Plaintiff satisfies both.

The third prong requires that the employer disciplined Reed for failure to comply with the conflicting employment requirement. The specific punitive action in this case is alleged to be the written reprimand issued to Reed on September 12, 2018, regarding the events on July 4, 2018. Plaintiff must therefore show that the written reprimand rises to the level of "some adverse employment action as a result of his failure to comply" with the requirement to attend the flag raising ceremony. *E.E.O.C. v. Consol Energy, Inc.*, 860 F.3d 131, 143 (4th Cir. 2017), *cert.*

*denied sub nom. CONSOL Energy Inc. v. E.E.O.C.*, 138 S. Ct. 976 (2018) (citing *Firestone Fibers*, 515 F.3d at 312).

The evidence linking the written reprimand to the events surrounding the flag ceremony is thin – the reprimand itself does not mention the ceremony, the boy scouts, or the Church of the Latter Day Saints. In the light most favorable to Plaintiff, however, the Court will assume for the sake of argument that a genuine issue of material fact might arise from communications in the engine on the way back to the station from Fairfax Hospital. Reed, Withrow, and Capt. Hurst all reported that the morning's events at the church would be dealt with further at the station, in addition to the fallout from the verbal altercation. *See, e.g.*, Dkt. 39 Ex. 66, Report from Captain I Stephen Hurst to Deputy Chief Garrett ("I told [Reed] I would call someone – BC403 – when we get back, and that he and I needed to speak as well about this morning's event."); *Id.* Ex. 63, Memorandum from Probationary Firefighter Donovan Withrow to Captain I Stephen Hurst ("Upchurch also mentioned Reed not participating in the event we were invited to that morning.").

If the Court assumes, *arguendo*, that Reed has a colorable claim,[8] then the inquiry is limited to the degree of severity of the reprimand, and whether it rises to the requisite level of an adverse retaliatory action.[9] The Fourth Circuit has referred to the third prong of a religious

---

[8] The Court is not persuaded that there is any material change in Reed's employment status at the FRD; nor has Plaintiff shown that his social relationship with shift mates has gotten any worse than it already was before July 4, 2018. Reed speculates as to the reactions of his superiors to his last-minute request for accommodation, and texted his wife that "there's going to be drama" before anything dramatic happened. Dkt. 39 Ex. 2, Reed Dep. 207:10. Moreover, Reed did not have a congenial relationship with anyone at the FRD before July 4, 2018. Reed testified by deposition that he had no conversations with anyone on the shift prior to the Boy Scout event, stating, "I didn't speak to them at all ... I probably was there for a month, five or ten days since the whole MRSA incident, so – yeah, it wasn't the best environment. So I wasn't really speaking to anyone, in general." *Id.* at 209:17-210:10.

[9] The exact reason for the written reprimand, be it a failure to follow sick leave procedures, or for improper yelling at shift mates or superiors, is not relevant at this stage.

accommodation claim under Title VII with the typical language used for a disparate treatment claim: "adverse employment action." *Consol Energy, Inc.*, 860 F.3d at 143. On the whole, courts rarely address the sufficiency of the discipline in a religious accommodation claim, as plaintiffs generally come forward with claims after clearly adverse actions like termination or a reduction in pay. *See, e.g., Firestone Fibers*, 515 F.3d at 311 (termination); *Brennan v. Deluxe Corp.*, 361 F. Supp. 3d 494, 499 (D. Md. 2019) (salary reduction, termination four months later); *E.E.O.C. v. Mission Hospital, Inc.*, No. 1:16-cv-00118-MOC-DLH, 2017 WL 3392783, at *3 (W.D.N.C. Aug. 7, 2017) (termination); *Consol Energy, Inc.*, 860 F.3d at 143 (constructive discharge considered as termination).

While the standard for the third prong of a religious accommodation claim is not easily delineated, "[a]s the statutory language of § 2000e(j) makes clear, this is not an area for absolutes." *Firestone Fibers*, 515 F.3d at 313. In a similar vein, the Supreme Court held in *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006) that, "the antiretaliation provision does not confine the actions and harms it forbids to those that are related to employment or occur at the workplace . . . the provision [also] covers those (and only those) employer actions that would have been materially adverse to a reasonable employee or job applicant." While this antiretaliation standard is construed more broadly than that for an adverse employment action in a typical Title VII discrimination claim, "retaliatory actions do have to be 'materially adverse'—such that they 'might have dissuaded a reasonable worker' from engaging in protected activity." *Strothers v. City of Laurel, Maryland*, 895 F.3d 317, 327 (4th Cir. 2018) (quoting *Burlington*, 548 U.S. at 68). While much of the case law is specific to retaliation claims under Title VII, the Court finds it instructive here, as the disciplinary action at issue in a religious accommodation claim is also retaliatory.

Plaintiff alleges that the written reprimand was materially adverse to him because it "mark[ed] Plaintiff as the wrongdoer" and made him "ineligible for promotion for two years." Dkt. 16 at 5. Construing the pleadings in Plaintiff's favor, his Amended Complaint alleges additional harm. He states in very general terms that, "[a]s a direct and proximate result of this unlawful discrimination, Plaintiff has suffered and continues to suffer injuries in the form of personal and professional humiliation and embarrassment, loss of pay, career damage, loss of enjoyment of life, as well as other emotional distress, pain and suffering." *Id.* at 6. Yet the analysis of these additional alleged injuries must stop here, as the record establishes none of this directly; the Court has no basis to consider them further.[10]

The only support Plaintiff cites to claim that a written reprimand is a materially adverse action is *Hernandez v. Fairfax Cty.*, 719 Fed. App'x 184 (4th Cir. 2018). *See* Dkt. 41 at 25. In *Hernandez*, the Fourth Circuit agreed with the district court that "the written reprimand issued in June 2015, which would remain on Hernandez's permanent record for three years and rendered her ineligible for any promotions for at least one year, qualifie[d] as an adverse employment action." *Id.* at 189. Plaintiff argued repeatedly in his Amended Complaint that the written reprimand rendered him "ineligible for promotion for at least two years." Dkt. 16 at 5-6.

Defendant explains in its Reply that Chief Butler, appointed eleven days before the relevant reprimand was issued to Reed, "does not endorse or follow the FRD's previous unwritten practice of prohibiting or delaying promotions based on the issuance of a written

---

[10] Elsewhere in the record Plaintiff cites to similarly vague lists of harms, though few of them are distinguishable from typical work stressors. This is particularly so where the employee has an undisputed history of discipline at his place of work for failure to cooperate, as Reed does, separate and apart from the religious accommodation at issue. Dkt. 42 Ex. 6, Reed Dep. 292:18-21 ("Q: What kind of emotional issues are you having as a result of the events claimed in your lawsuit? A: Sleep, stress at work, fear of messing up, creating some other issue, continuous discipline.").

reprimand within the previous twelve months." Dkt. 42 at 13. To illustrate Plaintiff's continued promotional opportunities and confirm Chief Butler's policy, "[i]n December 2018, Reed applied to participate in the promotional and proficiency examination for the master technician rank." *Id.* at 14. While Plaintiff failed to achieve a passing score on the eligibility test, Defendant notes Reed was in no way precluded from applying for the higher position. Plaintiff testified that he sat for promotional exams for the positions of Lieutenant and Master Technician, but did not achieve a passing score on either of them. *See id.* Ex. 6, Reed Dep. 290:8-292:8.

"Courts in the Fourth Circuit have generally found that actions which essentially amount to criticism of an employee such as performance evaluations, reprimands or warnings, and counseling are alone insufficient to constitute materially adverse employment actions under the [*Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53 (2006)] standard." *Cornelius v. McHugh*, No. CA 3:13-1018-CMC-PJG, 2015 WL 5012843, at *8 (D.S.C. Aug. 21, 2015), *aff'd*, 654 F. App'x 141 (4th Cir. 2016); *see also Altman v. McHugh*, No. 5:11cv00061, 2012 WL 1190271, at *17 (W.D. Va. April 9, 2012) ("In the Fourth Circuit, a negative performance evaluation alone, without any accompanying injury or change in the terms or conditions of employment, is insufficient to constitute a materially adverse employment action in order to establish a cause of action for retaliation.") (collecting cases). The Fourth Circuit itself, in an unpublished opinion, has also come to this conclusion. *Parsons v. Wynne*, 221 Fed. App'x 197, 198 (4th Cir. 2007) ("Neither her May 2002 performance evaluation nor her removal from the alternate work schedule would have dissuaded a reasonable worker from making or supporting a charge of discrimination.").

But in other circuits, "[a] formal reprimand can be an adverse action for purposes of a retaliation claim, 'even when ... the letter does not directly or immediately result in any loss of

wages or benefits, and does not remain in the employment file permanently,' because 'it can reduce an employee's likelihood of receiving future bonuses, raises, and promotions, and it may lead the employee to believe (correctly or not) that his job is in jeopardy'" *Bowen-Hooks v. City of New York*, 13 F. Supp. 3d 179, 227 (E.D.N.Y. 2014) (quoting *Millea v. Metro-N. R. Co.*, 658 F.3d 154, 165 (2d Cir.2011)). Some courts in the Fourth Circuit have found that written reprimands constituted materially adverse actions where, for instance, the reprimands rendered the subject ineligible for raises or promotions for a set number of years, or suggested a step toward termination. *See, e.g., Hernandez, supra; Nye v. Roberts*, 145 Fed. App'x 1, 5 (4th Cir. 2005) ("[T]he evidence is such that a reasonable jury could find that, in the context of the Board's system of progressive discipline, the reprimand and performance evaluation resulted in a material change in Nye's employment status").

Based on the law as it stands, and given Reed's continued employment with the County,[11] ineligibility for a promotion was Reed's most persuasive argument to show a materially adverse action against him. But Plaintiff's performance evaluation—soon after the reprimand, signed October 9, 2018—expressly indicates he was, in fact, eligible for a merit pay increase. Dkt. 39 Ex. 84 at 6. While a promotion is not expressly addressed in the evaluation, the Court is unaware of any evidence in direct support of Plaintiff's claim. Notably, this argument was absent from Plaintiff's response to the instant motion, and Reed concedes that Butler was acting Fire Chief at the time of the reprimand in question. *See* Dkt. 41 at 4, 6, 24, 26, 27. Given that Defendant asserts Reed is not precluded from consideration for a promotion under Fire Chief

---

[11] To place the inquiry in context, Plaintiff does not dispute Defendant's statement that "[o]n November 10, 2018, Reed was transferred, at his request, to Fire Station 17." Dkt. 39 LMF, ¶ 117. Indeed, Plaintiff did not face termination and—it is the Court's understanding—Reed remains employed by the FRD.

Butler's regime, and that Reed was permitted to take performance exams in pursuit of higher positions, the Court finds insufficient evidence that Plaintiff was ineligible for a promotion.

While the written reprimand remains in Plaintiff's file, there is no indication or argument that this, in Reed's case, is enough to establish "a discriminatory act that 'adversely affect[s] the terms, conditions, or benefits of the plaintiff's employment.'" *Holland v. Washington Homes, Inc.*, 487 F.3d 208, 219 (4th Cir. 2007) (quoting *James v. Booz–Allen & Hamilton, Inc.*, 368 F.3d 371, 375 (4th Cir.2004) (internal quotation marks omitted)). To the contrary, Reed's employment status appears unchanged, and any adverse effects from the reprimand are negligible.

In sum, the record shows no genuine issue of fact regarding a materially adverse act by the County, and Plaintiff fails to establish the third prong of his discrimination claim.

### B. Claim for Retaliation Under Title VII.

The prima facie retaliation case must show three elements, including, first, that Reed engaged in a protected activity. The County concedes this point. Dkt. 42 at 17 n.31 ("For purposes of summary judgment, the County accepts that Reed engaged in ... protected activities."). To address the second prong is to engage once more in the analysis of whether the County "took an adverse employment action" against Reed when it issued a written reprimand. *E.E.O.C. v. Navy Fed. Credit Union*, 424 F.3d at 406. As explained in some detail, *supra* Section IV.A.2, the facts of this case do not satisfy the relevant standard required for a materially adverse action for a Title VII retaliation claim.

Without this materially adverse action, the claim must fail, and the Court need not discuss the third element here. Nevertheless, the parties argue the third element—the causal link between the protected activity and the materially adverse action—at great length. After review

of these arguments and the accompanying evidence in the record, the Court does not find there to be facts that would affect the Court's conclusions herein.

## V. CONCLUSION

For these reasons, Defendant's Motion for Summary Judgment (Dkt. 38) is hereby **GRANTED**.

It is **SO ORDERED**.

January 15, 2020
Alexandria, Virginia

Liam O'Grady
United States District Judge